IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL F. PETERSON,                          )
          Plaintiff,                      )
                                          )
   vs                                        )          Civil Action No. 1:14-cv-317
                                          )
ANTHONY C. OPRENDEK, et al.,                 )
          Defendants.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Daniel F. Peterson, brings this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Defendants, Anthony C. Oprendek and Benjamin E. Zimmer, employees of the Pennsylvania Department of Environmental Protection (PADEP), violated his right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution in 2012 when they altered a determination as to whether a gas company had committed a violation of state law when it left a pile of stumps and logs from trees it had cut at a proposed well site on his property. Specifically, he alleges that, although Zimmer initially prepared a report indicating that a violation had been committed, he and Oprendek subsequently changed the report to conclude that no violation had been committed and that they did so out of animus toward him, based upon his cooperation with an investigation into PADEP by the Pennsylvania Inspector General in 2003.

Currently pending before the Court is a motion to dismiss Plaintiff's Complaint. Zimmer and Oprendek argue that it is untimely, that it fails to state a claim for "class of one" equal protection, that they are protected by the doctrine of qualified immunity, that the John and Jane Doe Defendants Plaintiff also names should be dismissed because Plaintiff alleges no facts concerning them and that amendment of the Complaint would be futile. Plaintiff opposes these arguments. For the reasons that follow, the motion will be granted.

Facts

Plaintiff indicates that, in 2007, he entered into an agreement with D&L Energy, a gas drilling company, to drill and operate a gas well on his property, 16982 Lynn Road, Saegertown, Pennsylvania. (Compl. ¶¶ 2, 8, 20.)[1] In 2008, D&L Energy prepared to commence drilling by clear cutting approximately three acres of trees. In accordance with D&L Energy's Erosion and Sediment Control Plan, the trees and vegetation removed from the well pad area were piled to create a 15 ft. high by 30 ft. wide by 150 ft. long erosion and sediment control structure, also known as an energy dissipater or sediment filter. D&L Energy also constructed a well pad and an access road on the property. In 2009, before drilling a well, D&L Energy decided to abandon the project, but left the 15 ft. high by 30 ft. wide by 150 ft. long pile of debris on Plaintiff's property. Since that time, debris has accumulated and the pile has settled and decayed. As of December 2014, the debris pile is roughly 7-10 ft. high by 32-46 ft. wide by 192 ft. long. Plaintiff states that this debris pile, which is easily seen from his dining room and when he is elsewhere on his property, persists as an eyesore on the property. (Compl. ¶ 20 & Exs. A-D.)

On October 10, 2012, after encountering trouble resolving the site remediation matter through a civil suit with D&L Energy, Plaintiff sent a letter to Michael Krancer, then Secretary of the PADEP, alerting the agency to potential violations at the site and requesting an investigation of the matter. (Compl. ¶ 21.) On October 19, 2012, Defendant Benjamin Zimmer visited Plaintiff's property and conducted an inspection of the site. Later that day, Zimmer verbally informed Plaintiff that he found a violation on the site, that he was writing a notice of violation ("NOV") to be sent to D&L, and that he would receive a copy of the report and NOV in the mail. (Compl. ¶ 22.) Plaintiff, who was employed by PADEP as the Storage Tank Section

_____

[1] ECF No. 24.

Chief in the Northwest Regional Office from 1990 until his retirement in 2011 (Compl. ¶ 8), explains that an NOV is an enforcement document that PADEP employees issue that communicates to the recipient that it is or may be in violation of the law. Issuing an NOV can lead to the resolution of a legal violation without the need for a formal administrative order or other action. (Compl. ¶ 23.)

On November 2, 2012, Plaintiff called Zimmer to ask about the report and the NOV because he had not yet received his copies. Shortly after this phone call, the second defendant, Anthony Oprendek, called Plaintiff. Oprendek told him that there were no violations observed on his property. (Compl. ¶¶ 24-25.)

Plaintiff states that, on November 5, 2012, he filed a document request pursuant to Pennsylvania's Right To Know Law because he was upset and distressed by the contradictory messages he received from the Defendants and wanted to learn why Zimmer's findings, as expressed to him verbally on October 19, were suddenly contradicted by both Zimmer and Oprendek, and were ultimately reversed. In this Right To Know request, Plaintiff requested the permit file for the well site on his property in addition to a copy of the October 19, 2012 inspection report and NOV written by Zimmer. (Compl. ¶ 26.)

Plaintiff received a letter dated November 6, 2012 from Michael Krancer stating that, in response to his October 10, 2012 letter, an inspection had been conducted and the conclusion was that there were no violations on the property. Mr. Krancer's letter included a copy of an inspection report, dated October 19, 2012, finding no violations. (Compl. ¶ 27 & Ex. E.) The letter stated that:

> Our inspection verified that cut trees and grubbed material remain piled in a wind-
> row immediately downslope of the area initially cleared to facilitate well pad
> construction on your property. However, the district field staff also documented
> that the site has been graded and stabilized, and that the area has been restored in

compliance with requirements set forth in the Oil and Gas Act and DEP's coincidental regulatory requirements. Additionally, no violations of the Solid Waste Management Act were observed during the inspection.

Regarding your concern with the aforementioned trees and grubbed material, I have been advised that it is currently an accepted and common practice for operators to pile and leave these windrow areas during well pad construction and after the site has been restored. Typically, surface landowners address these types of issues while developing lease contract terms in advance of the project.

Please understand that DEP must operate within the jurisdictional boundaries of its laws and does not have the regulatory authority to direct further action at the site.

(Compl. Ex. E at 1.)

Plaintiff states that December 13, 2012, PADEP's final response to his November 5, 2012 Right To Know request granted him access to some of the items he requested, including a copy of the October 19, 2012 inspection report found in the Office Of Oil And Gas permit file. This copy of the inspection report is identical to the Original Inspection Report attached to Mr. Krancer's November 6 letter except that Zimmer's signature appear to be different ("Second Inspection Report"). (Compl. ¶ 28 & Exs. F, G.) The response also explained that the "records do not exist" for a "Notice Of Violation of 10/19/2012 by Ben Zimmer."

On December 17, 2012, Plaintiff filed a letter with the Pennsylvania Office Of Open Records stating that, contrary to the response he received to his Right To Know request, he believed an inspection report indicating a violation and an NOV did, in fact, exist. On December 19, 2012, Plaintiff filed an appeal with the Office Of Open Records challenging, in part, the response that PADEP did not possess all of the records he requested. On December 26, 2012, Staci Gustafson, the Assistant Regional Director of the Northwest Regional Office of PADEP, wrote a letter to Plaintiff stating that he:

may be seeking something other than the Original Inspection Report for the D&L Energy Site. To that extent, and within the Department's discretion, we have

enclosed a "Draft Document" which contains a Draft report and Draft description of violation, which is what you may have intended to request but did not do so with sufficient specificity.

Please note that this Draft Document is *not* "the record" of the Department's inspection of the D&L Energy Site on October 19, 2012, as that term is defined in the RTKL. The Original Inspection Report is the record that documents the Department's activity of inspecting the D&L Energy Site on October 19, 2012. The Original Inspection Report was created in accordance with applicable Department statutes and regulations, at all times was retained in the Department's public file, and was previously provided to both D&L Energy, Inc. and to you.

(Compl. ¶¶ 29-31 & Ex. H at 2.)

The letter included an attached Surface Activities Inspection Report of an investigation conducted by Zimmer on October 19, 2012 at Plaintiff's property. This document was stamped "DRAFT," concluded there was a violation, and included an NOV ("Draft Inspection Report"). Plaintiff contends that, after reading the Draft Inspection Report and comparing it to the other two reports, he began to realize that Defendants had harmed him through the inspection process by reversing the initial finding and not pursuing a legitimate enforcement action. (Compl. ¶ 31.)

Plaintiff notes that there are three different versions of the October 19, 2012 inspection report documenting Zimmer's inspection. He received the Original Inspection Report as an attachment to Mr. Krancer's November 6, 2012 letter. He received the Second Inspection Report as part of the documents requested in his Right to Know request for documents in the Northwest Regional Office permit file. Finally, he received the third inspection report, the Draft Inspection Report, as an attachment to Ms. Gustafson's December 26, 2012 letter. (Compl. ¶ 32.)

Plaintiff contends that the Draft Inspection Report confirms what Zimmer verbally expressed on October 19, 2012, and contradicts the other inspection reports signed by Zimmer as well as what Oprendek verbally communicated to him on November 2, 2012. In the Draft Inspection Report, Zimmer states that:

During my field inspection today [I] found the site not restored in a satisfactory manner. Specifically, I found a large portion of the ground surface on the well pad site to be very rough and in need of grading. I also found on the site, remnants of silt fence and a large pile of logs and stumps, stacked approximately 15 feet high and measuring approximately 30' wide by 150' long…

These issues outlined above must be corrected and constitute a violation of Pennsylvania Title 25, Chapter 78.65.2, which states "If a well site is constructed and the well is not drilled, the well site shall be restored within 30 days after the expiration of the well permit unless the Department approves an extension for reasons of adverse weather or lack of essential fuel, equipment or labor."

(Compl. ¶ 33 & Ex. H.)

In direct contradiction, however, the Original Inspection Report states that:

During my field inspection today I found the site returned to the original contour and completely stabilized. I did find a small amount of silt fence on the site; also I found a pile of stumps and logs that had been cleared from the site pushed to, and piled on the east edge of the site. This pile measures approximately 15' high and was about 30' wide by 150' long. I recommend the operator, D&L Energy Inc., contact the surface owner to discuss removing the silt fence. No violations.

(Compl. ¶ 34 & Ex. E.) Plaintiff notes that the Draft Inspection Report is further differentiated from both the Original Inspection Report and the Second Inspection Report because it includes a third page titled "Notice of Violation(s)." The third page provides a description of the violation, a citation to the specific regulation at issue, and instructions for the violator's response. This page also includes a "Cert. Mail #" and "Mail Date" indicating the report was mailed to the violator by certified mail on October 22, 2012. The other two versions of the inspection report do not indicate they were mailed. (Compl. ¶ 35.)

All three versions of the report include the same inspection record number. Plaintiff states that, upon information and belief, the inspection record number is not generated until the inspector's inspection report is entered into eFACTS, PADEP's online permit and compliance tracking system. It is unclear how an inspection report marked DRAFT would include an eFACTS inspection record number unless a decision to revise the draft was made after the

inspection report was entered into eFACTS. Therefore, Plaintiff suspects that Oprendek was the last person to edit the record of the inspection in eFACTS. (Compl. ¶ 36.)

All three versions of the report include two signatures of the inspector, Defendant Zimmer. Upon close review, however, each signature appears to be different. Plaintiff contends that this indicates that Zimmer signed three separate versions of the report. (Compl. ¶ 37.) All three versions of the report include the same reference to the date and time of the inspection: October 19, 2012 at 13:30. (Compl. ¶ 38.)

Plaintiff contends that Defendants arbitrarily and without adequate reason decided to alter the Draft Inspection Report based upon animosity towards him. He notes that, in 2003, while he was a Section Chief with PADEP in the Northwest Regional Office, he participated in a Pennsylvania Inspector General's investigation into internal PADEP enforcement procedures and decisions. After the investigation concluded, Plaintiff felt that, because he participated in the investigation his opportunities for promotion were nonexistent. After more than 30 years of service, Plaintiff retired from PADEP in 2011. Plaintiff alleges that the Defendants' actions stem from continued animosity towards him in part due to his willingness to speak to the Inspector General and others about the internal happenings of the Department. (Compl. ¶ 39.)

Plaintiff states that there is no indication that PADEP makes a practice of revising inspection reports after coming to a conclusion. In fact, just the opposite is true. According to PADEP's April 2004 Policy For Standards And Guidelines For Identifying, Tracking, And Resolving Violations:

> All programs should incorporate the Department standard requiring that all violations be documented in writing in an inspection report on the date of the inspection and presented to the facility before ending the inspection, if possible. If the violation(s) cannot be determined on the date of the inspection because the receipt of sample results and/or further information is necessary, the "Inspection Results" field should be marked as 'Pending.' The determination of the violation

and the completion of the inspection report should be done within 14 calendar
days after receiving this necessary further information.

(Compl. ¶ 40) (citing Standards And Guidelines For Identifying, Tracking, And Resolving

Violations (April 4, 2004), available at

http://www.dos.state.pa.us/portal/server.pt/document/504415/standardsandguidelines_pdf (last

checked December 15, 2014).

Plaintiff states that, from 1990 to 2011, he served as the Storage Tank Section Chief in

the Northwest Regional Office, the same office where the Defendants are employed.  During his

time as Section Chief, Plaintiff was in charge of enforcement and he also supervised PADEP

inspectors as well as third party inspectors hired by PADEP.  In this role, Plaintiff reviewed

thousands of inspection reports and never saw an inspection report marked "DRAFT." He had

discussions with inspectors about enforcement and notices of violation but never asked an

inspector to alter the findings of an inspection.  Plaintiff also never saw the findings of a written

inspection report reversed.  He is not aware of any PADEP policy or guidance relating to draft

inspection reports.  Other than the Draft Inspection Report at issue in this complaint, Plaintiff

never saw an inspection report stamped "DRAFT." (Compl. ¶ 41.)

Plaintiff contends that D&L Energy's failure to properly remediate the site was a

violation of Pennsylvania law, and there is no identifiable reason why the Defendants should

have changed their opinion that D&L Energy was in violation.  As referenced in the Draft

Inspection Report, pursuant to 25 Pa. Code § 78.65(2), "[i]f a well site is constructed and the

well is not drilled, the well site shall be restored within 30 days after the expiration of the well

permit unless the Department approves an extension for reasons of adverse weather or lack of

essential fuel, equipment or labor."  PADEP's regulations pertaining to erosion and sediment

control at 25 Pa. Code § 102.22(a) further require that, "[u]pon final completion of an earth

disturbance activity… the site shall immediately have topsoil restored, replaced, or amended, seeded, mulched or otherwise permanently stabilized and protected from accelerated erosion and sedimentation."  Additionally, "once permanent stabilization has been established, the temporary E&S BMPs shall be removed." § 102.22(a)(1).  This comports with D&L's erosion and sediment control plan which requires the company to reclaim the site and remove erosion and sedimentation controls.  D&L's plan also calls for annual site inspections and restoration of reclamation as necessary.  The PADEP's Oil and Gas Operator's Manual also requires that the timing for installation and removal of erosion controls is one of the factors to be considered in developing an erosion and sediment control plan for earth disturbance activities.  PADEP Oil and Gas Operator's Manual, Doc. No. 550-0300-001, Chapter 4, page 15 (Oct. 30, 2001) (http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-48243/chap4.pdf) (last checked, December 16, 2014).  (Compl. ¶ 42 & Ex. I.)

Plaintiff contends that, other than animosity towards him or some other motive to treat him differently to those similarly situated, it is unclear why the Defendants decided to alter the conclusions of the Draft Inspection Report.  There is no evidence of a rational basis for altering this finding.  (Compl. ¶ 43.)

Plaintiff alleges that, had Defendants proceeded based on the original course of action, which was to find a violation based on the inspection and to pursue enforcement initially through a notice of violation, he would not have been treated unequally and the enforcement could have led to D&L Energy properly removing the debris pile.  (Compl. ¶ 44.)  He states that he has suffered both financial and emotional harm as a result of the unlawful treatment he experienced from the Defendants.  He incurred the cost of hiring attorneys to assist in rectifying the harm the Defendants caused.  Further, because the Defendants reversed the finding of a violation in the

Draft Inspection Report, Plaintiff lost an opportunity to engage with D&L Energy concerning violations on the site.  D&L Energy filed for Bankruptcy in April 2013.  If the October 19, 2012 inspection led to an NOV this would have occurred prior to D&L's bankruptcy, at a time when the company may still have been able to address the violations.  Defendants' alteration of the Draft Inspection Report, however, resulted in Plaintiff missing this opportunity.  (Compl. ¶¶ 45-46.)

Additionally, Plaintiff states that he incurred the costs of filing Right To Know requests and appealing the Office Of Open Records determination.  If he is forced to remove the vegetative erosion control structure himself and fully remediate the site, he will additionally incur the costs of this remediation.  Plaintiff notes that he contacted an excavator to estimate the cost of removing the vegetation pile known as an energy dissipater or sediment filter, re-grading the site, and seeding and mulching the area.  The excavator's estimated cost totaled $19,250.00. (Compl. ¶¶ 47-48.)

In addition to financial harm, Plaintiff alleges that he suffered emotional and mental harm from the stress and anguish caused by the view from his home of the unremediated property and the remaining pile of excess vegetation described as an energy dissipater or sediment filter in the site Erosion and Sediment Control plan and left on his property.  As a result of the Defendants' alteration of the findings of the inspection report, he has also spent a considerable amount of personal time researching this matter and reaching out to various State and Federal government entities for assistance.  (Compl. ¶¶ 49-50.)

Plaintiff alleges that his emotional harm additionally stems from the anguish caused by requesting help from his state government and being treated differently from any other similarly situated individual.  Plaintiff has lost trust in his state government and lost the sense of pride he

once felt as a former PADEP employee.  He is shocked and dismayed that PADEP employees would take actions in direct opposition to the Agency's commitment to an open, transparent, and accountable government. The latest tactics, taken by the Defendants and alleged in this complaint, renew Plaintiff's fear of retaliation for his cooperation in the Inspector General's 2003 investigation.  He is worried about his personal safety and that of his wife.  He is very concerned knowing that, even though he retired from PADEP, he is not beyond the reach of those who wish to harass and harm him.  (Compl. ¶ 51.)

Procedural History

Plaintiff filed this action on December 23, 2014.  Federal question jurisdiction is asserted over the civil rights claim, 28 U.S.C. §§ 1331 and 1343, and the complaint is brought pursuant to 42 U.S.C. § 1983.  As noted above, the Complaint alleges that Defendants' actions deprived him of the equal protection of the laws.  He seeks a declaration that his right to equal protection has been violated, a preliminary and permanent injunction that would thwart any attempts by Defendants to cause him harm and that will lead to the clearing of the debris pile on his property, an award of compensatory damages in an amount to be determined, an award of punitive damages, attorney's fees and costs, with interest pursuant to 42 U.S.C. § 1988(b), and any such other equitable remedy or relief that the Court deems just and proper.

On March 27, 2015, Defendants filed a motion to dismiss (ECF No. 11).  Plaintiff filed a brief in opposition to the motion to dismiss on April 27, 2015 (ECF No. 19) and Defendants filed a reply brief on May 11, 2015 (ECF No. 22).  Plaintiff requested leave to file a sur-reply brief, which was granted, and he filed his sur-reply brief on May 21, 2015 (ECF No. 25).

Standard of Review

The Supreme Court has issued two decisions that pertain to the standard of review for a

motion to dismiss for failure to state a claim upon which relief could be granted under Federal Rule of Civil Procedure 12(b)(6).[2]  The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests."  Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (citations omitted).  Mere "possibilities" of misconduct are insufficient.  Id. at 679.  The Court of Appeals recently summarized the inquiry as follows:

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id. This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

"Generally, in ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record."  Sands v. McCormick, 502 F.3d 263, 268 (3d

---

[2] Although Defendants also cite Rule 12(b)(1)—which applies to dismissals for lack of subject matter jurisdiction—in passing, their arguments are all based upon Plaintiff's failure to state a claim upon which relief could be granted, which is governed by Rule 12(b)(6).

Cir. 2007) (citation omitted). The Complaint attaches a number of exhibits (including the Original Inspection Report, the Second Inspection Report and the Draft Inspection Report), all of which may be considered in reviewing the pending motion to dismiss.

Defendants argue that: 1) Plaintiff's claim is untimely, as the Complaint and attachments clearly demonstrate that he knew that PADEP had changed its finding of a violation to a finding of no violation by no later than November 2, 2012 but he did not file this action until December 23, 2014; 2) his "class of one" equal protection claim fails because he cites to no comparators, the mere allegation of "animosity" is insufficient and the letter he received provided him with a rational basis for a finding of no violation, and even his own evidence demonstrates that he is complaining not about environmental harm, but esthetic concerns, which are not within PADEP's jurisdiction; 3) the named Defendants are entitled to qualified immunity because he has identified no constitutional violation and has pointed to no rights that were clearly established; 4) the John and Jane Doe Defendants should be dismissed because he makes no factual allegations about them; and 5) amendment of the Complaint would be futile because Plaintiff cannot cure these deficiencies. [3]

Plaintiff responds that: 1) his claim is timely because it only accrued on December 27, 2012, when he obtained the Draft Inspection Report which led him to understand how he had been treated differently; 2) in a "class of one" equal protection claim, it is not necessary to identify comparators in the Complaint, and alleging a lack of rational basis for a decision and/or animus is sufficient, and he does not have to allege environmental harm; 3) Zimmer and Oprendek are not entitled to qualified immunity because they knew or should have known that

---

[3] Defendants also argue that Plaintiff has no constitutional right to have PADEP investigate or enforce actions and that he fails to recite the elements of a retaliation claim. However, in his response, Plaintiff indicates that he is not raising either of these claims, so they will not be discussed further.

their actions were improper and their actions were so outrageous and patently violative of his rights that no further consideration is necessary; 4) John and Jane Doe Defendants can be dismissed only when all of the named defendants are dismissed, which should not occur here; and 5) he should be permitted to amend his Complaint.

In a reply brief, Defendants argue that: 1) based on his Complaint and the attachments thereto, Plaintiff indicates that he knew on November 2, 2012 that they had reversed the finding (conveyed to him orally on October 19, 2012) of a violation on his property and the "DRAFT" stamp is not the basis for the harm he alleges, so it cannot extend the date on which his claim accrued; 2) the cases he relies upon for his "general allegation" pleading standard for a class of one equal protection claim predate and do not survive Iqbal; and 3) Plaintiff does not suggest what he would plead in an amended complaint to show that they are not entitled to qualified immunity, so amendment would be futile.

In a sur-reply brief, Plaintiff argues that the Third Circuit allows for the pleading of a class of one equal protection claim without naming comparators, regardless of what the Second Circuit may have decided. He contends that he only needs to allege that similarly situated parties plausibly exist, as he has done.

Statute of Limitations

The Court of Appeals has stated that:

Technically, the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer. Rule 12(b) states that " [e]very defense ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion...." The defenses listed in Rule 12(b) do not include limitations defenses. Thus, a limitations defense must be raised in the answer, since Rule 12(b) does not permit it to be raised by motion. However, the law of this Circuit (the so-called "Third Circuit Rule") permits a limitations defense to be raised by a motion under Rule 12(b)(6), but only if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." Hanna v.

14

> U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975). "If the bar is
> not apparent on the face of the complaint, then it may not afford the basis for a
> dismissal of the complaint under Rule 12(b)(6)." Bethel v. Jendoco Constr. Corp.,
> 570 F.2d 1168, 1174 (3d Cir. 1978).

Robinson v. Johnson, 313 F.3d 128, 136 (3d Cir. 2002) (footnote omitted). Defendants argue

that the Complaint facially shows noncompliance with the limitations period. Plaintiff contends

that the Complaint does not show noncompliance.

Because Congress did not establish a statute of limitations for civil rights claims, federal

courts "borrow" state statutes of limitations governing analogous causes of action. Wilson v.

Garcia, 471 U.S. 262, 276 (1985) (for claims brought under 42 U.S.C. § 1983). Under

Pennsylvania law, the statute of limitations for personal injuries is two years, 42 Pa. C.S.

§ 5524(2), and that statute is applied to § 1983 claims. Garvin v. City of Phila., 354 F.3d 215,

220 (3d Cir. 2003).

Unlike the selection of the limitations period, the date the cause of action accrues is

governed by federal law. Wallace v. Kato, 549 U.S. 384, 388 (2007). The Court noted that:

> Under those principles, it is "the standard rule that [accrual occurs] when the
> plaintiff has 'a complete and present cause of action.'" Bay Area Laundry and
> Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201, 118
> S.Ct. 542, 139 L.Ed.2d 553 (1997) (quoting Rawlings v. Ray, 312 U.S. 96, 98, 61
> S.Ct. 473, 85 L.Ed. 605 (1941)), that is, when "the plaintiff can file suit and
> obtain relief," Bay Area Laundry, supra, at 201, 118 S.Ct. 542.

Id. In other words:

> the tort cause of action accrues, and the statute of limitations commences to run,
> when the wrongful act or omission results in damages. The cause of action
> accrues even though the full extent of the injury is not then known or predictable.
> Were it otherwise, the statute would begin to run only after a plaintiff became
> satisfied that he had been harmed enough, placing the supposed statute of repose
> in the sole hands of the party seeking relief.

Id. at 391 (citation omitted). These principles sometimes lead to harsh results, but they apply

nonetheless. See Kach v. Hose, 589 F.3d 626, 634-35 (3d Cir. 2009) (civil rights claims of

young woman, who ran away from home in 1995 at age 14 and lived with security guard for approximately 10 years, accrued in 1999 when she reached the age of majority and thus her suit, filed in 2006, was untimely).

The Complaint in this action was filed on December 23, 2014. Thus, the events upon which it is based must have occurred no earlier than December 23, 2012. But Defendants contend that the Complaint is based upon acts that occurred in October and November 2012, and that Plaintiff was fully aware of all the relevant facts by no later than November 2, 2012. Therefore, they contend that the Complaint is untimely.

Plaintiff responds that his cause of action did not accrue until December 27, 2012, the date he read the Draft Investigation Report that he received which indicated that Defendants originally found a violation. Defendants respond that the stamping of the word "Draft" on an inspection report is not the basis for his injury. Rather, Plaintiff is alleging that he was injured when Defendants changed their initial decision to find a violation to the opposite conclusion (no violation). They contend that, according to the Complaint itself, Plaintiff knew, by no later than November 2, 2012, that this reversal occurred because: 1) he knew of the initial decision to find a violation when he spoke to Zimmer on October 19, 2012; and 2) he learned that PADEP had changed the result to a finding of no violation when he spoke to Zimmer and Oprendek on November 2, 2012. Further, they argue that, even if there was any doubt about the matter, on November 6, 2012, a letter was sent to him from the Secretary of PADEP which confirmed that the Agency found no violation on his property.

Plaintiff appears to be invoking the discovery rule to delay the accrual of his claim. The Court of Appeals has recognized that:

> "As a general rule, the statute of limitations begins to run when the
> plaintiff's cause of action accrues ... the accrual date is not the date on which the

wrong that injures the plaintiff occurs, but the date on which the plaintiff *discovers* that he or she has been injured." <u>Oshiver [v. Levin, Fishbein, Sedran & Berman]</u>, 38 F.3d [1380,] 1385 [(3d Cir. 1994)] (citing <u>Cada v. Baxter Healthcare Corp.</u>, 920 F.2d 446 (7th Cir. 1990)) (emphasis in original). That is not to say that the accrual date is when a plaintiff learns he has been the victim of a legal wrong. Rather, a claim accrues as soon as a potential plaintiff either is aware, or should be aware after a sufficient degree of diligence, of the existence and source of an actual injury. <u>Keystone Insurance Co. v. Houghton</u>, 863 F.2d 1125, 1127 (3d Cir. 1988); <u>see also</u> <u>Cada</u>, 920 F.2d at 450. The discovery rule delays the initial running of the statute of limitations, but only until the plaintiff has discovered: (1) that he or she has been injured; and (2) that this injury has been caused by another party's conduct. <u>New Castle County v. Halliburton NUS Corp.</u>, 111 F.3d 1116, 1124 (3d Cir. 1997).

<u>Podobnik v. U.S. Postal Serv.</u>, 409 F.3d 584, 590 (3d Cir. 2005). In that case, a postal employee alleged claims of age discrimination, but his claims were untimely because he knew about his route reduction in 1993 and the intent to terminate or retire him in 1998; accrual was not delayed because he did not meet with an attorney and learn of his legal injury until 2000.

The question in this case is thus when Plaintiff knew—or in the exercise of reasonable diligence, should have known—that he had been injured by the actions of Defendants. The gravamen of Plaintiff's Complaint is that he was subjected to unequal protection of the laws when PADEP personnel changed an initial finding of a violation on his property of a regulation governing restoration of well sites by oil and gas operators to a finding of no violation. Plaintiff's Complaint and the documents attached to it leave no doubt that he had all the information needed to draw this conclusion no later than November 2, 2012, when he learned that PADEP was reporting no violation despite his having been told on October 19, 2012 that there was a violation. Based on this information, he could have brought suit on November 2, 2012 or at any time within two years thereafter.

Remarkably, Plaintiff contends that:

> Prior to seeing the inspection report marked "DRAFT", [he] only knew that the decision on whether to pursue enforcement was altered. Such an alteration

alone would not give rise to a violation of one's equal protection right. Instead, what gave rise to an equal protection injury was that Defendants did something out of the ordinary by adding the DRAFT mark to the initial report that found a clear violation, and then seemingly creating two different versions of the ultimate report finding no violation. Only when [he] saw the DRAFT mark and was able to compare the three report versions did he discover that Defendants were harming him by treating him differently to others similarly situated with no rational basis for doing so.

(ECF No. 19 at 4.)  Plaintiff appears to be arguing that his equal protection claim is based upon whether PADEP followed its usual internal procedures (which, he contends, never before contemplated the issuing of both a "draft" report and a later different report that came to the opposite conclusion).[4]  He has not explained how the equal protection clause of the United States Constitution is concerned with whether or not PADEP followed its usual internal procedures for the investigation of a complaint such as his.  This Court does not sit as a court of review concerning whether PADEP followed its usual internal procedures.  Defendants also note that Plaintiff does not allege that that he appealed Secretary Krancer's letter to the tribunal statutorily appointed to review PADEP actions, namely the Pennsylvania Environmental Hearing Board ("EHB").  See Machipongo Land & Coal Co. v. Commonwealth of Pa., Dep't of Envtl. Resources, 648 A.2d 767 (Pa. 1994) (EHB has exclusive jurisdiction to review final actions of PADEP).

Rather, the unequal treatment to which he was subjected would be the finding of "no violation" when similarly situated landowners (i.e., those with piles of trees and stumps, or at least similar debris, left on their property) received a finding of a violation from PADEP.[5]

---

[4] Plaintiff also contends that Defendants are seeking to move his injury back in time to the date when they stamped the word "Draft" on the inspection report even though he only learned of it later, but that is a misrepresentation of their argument.

[5] In addition, even if Plaintiff's argument made sense, it is completely unsupported by reference to any previous situation that bears any resemblance to it.  Therefore, Defendants' qualified immunity argument would apply in any event.

Plaintiff had all the information needed to allege his claim about this unequal treatment on November 2, 2012.

Everything he did after November 2, 2012 was in the nature of discovery that he could have conducted in this case after it was filed.  See Thomas v. Bushkill Twp., 2014 WL 958799, at *5 (E.D. Pa. Mar. 12, 2014) (the fact that plaintiff did not obtain documentary evidence in support of his claims that a neighbor's complaints about him were false until 2010 did not extend the date on which his claims accrued).  Conversely, accepting Plaintiff's argument that he did not "know" of his claim until the date he received the Draft Inspection Report would mean that, had he not received this report until months or years later, the statute of limitations would not have begun to run until that time.  There is no support for this contention.

Defendants have demonstrated that Plaintiff's Complaint facially shows noncompliance with the statute of limitations and it should be dismissed on this basis.  Nevertheless, even if the Complaint had been filed in a timely manner, it would still be deficient for the reasons that follow.

Equal Protection Claim

The Fourteenth Amendment provides that states shall not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  Equal protection "directs that 'all persons similarly circumstanced shall be treated alike.'"  Plyer v. Doe, 457 U.S. 202, 216 (1982) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)).  "This provision creates no substantive rights."  Vacco v. Quill, 521 U.S. 793, 799 (1997) (citation omitted).  Only when a state "adopts a rule that has a special impact on less than all persons subject to its jurisdiction" does a question arise as to whether the Equal Protection Clause is violated."  Alexander v. Whitman, 114 F.3d 1392, 1406 (3d Cir. 1997) (quoting New York City

Transit Auth. v. Beazer, 440 U.S. 568, 587-88 (1979)).

The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 563, 564 (2000) (citations omitted). "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they 'receiv[ed] different treatment from that received by other individuals similarly situated.'" Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (quoting Kuhar v. Greensburg-Salem Sch. Dist., 616 F.2d 676, 677 n.1 (3d Cir. 1980)). See also Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008); Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006) ("a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment.")

Plaintiff argues that the Court of Appeals for the Third Circuit has "found that general allegations of similarly situated individuals are sufficient, without identifying specific names of individuals." (ECF No. 19 at 8.) His citation in support of this proposition is Phillips v. County of Allegheny, 515 F.3d 224, 244 (3d Cir. 2008), which in turn relied upon DeMuria v. Hawkes, 328 F.3d 704 (2d Cir. 2003). But the foundation case no longer holds. In Ruston v. Town Board for the Town of Skaneateles, 610 F.3d 55 (2d Cir. 2010), a more recent case in which the plaintiff homeowners (the Rustons) alleged an equal protection violation by a town that refused to consider their application to create a new sewer district until a new zoning law allowed the town to deny it, but did not name any comparators, the Second Circuit concluded that:

the pleading standard set out in Iqbal supersedes the "general allegation" deemed sufficient in DeMuria, 328 F.3d at 707. Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. See Iqbal, 129 S.Ct. at 1950-51. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 129 S.Ct. at 1950). "We next consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." Iqbal, 129 S.Ct. at 1951; see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

The Rustons' complaint fails to allege facts that "plausibly suggest an entitlement to relief." As to the Town defendants, the Rustons' argument appears to be that the Town refused to consider their application while considering applications submitted by those similarly situated. However, the Rustons do not allege specific examples of the Town's proceedings, let alone applications that were made by persons similarly situated. The equal protection claim as to the Town defendants therefore fails for lack of factual allegations to support the legal conclusion.

Id. at 59. Thus, Ruston supersedes DeMuria and courts should no longer rely on DeMuria. More importantly, courts have concluded that the Supreme Court's decision in Iqbal has changed the legal landscape. See Professional Dog Breeders Advisory Council, Inc. v. Wolff, 752 F. Supp. 2d 575, 586 n.9 (E.D. Pa. 2010). See also Perano v. Township of Tilden, 423 F. App'x 234, 238-39 (3d Cir. Apr. 13, 2011) (plaintiff who simply alleged that he was treated differently from "other similarly situated residential and commercial developers" did not make plausible the conclusion that such parties existed and were like him in all relevant aspects). The court in Perano also approvingly cited a case for the proposition that the holding of DeMuria was "problematic in view of Iqbal…. Twombly and Iqbal require sufficient factual allegations to make the conclusion of similarly situated plausible." Id. at 238 (citing Toussie v. Town Bd. of Town of E. Hampton, 2010 WL 597469, at *6 n.3 (E.D.N.Y. Feb. 17, 2010)). See also Worth & Co. v. Getzie, 11 F. Supp. 3d 484, 491 (E.D. Pa. 2014) (complaint that failed to identify any other contractor who allegedly received more favorable treatment made it impossible to infer discrimination and therefore class of one equal protection claim was dismissed).

Plaintiff argues in a sur-reply brief that <u>Phillips</u> is still the law in the Third Circuit, citing <u>Pioneer Aggregates, Inc. v. Pennsylvania Dep't of Envtl. Protection</u>, 540 F. App'x 118, 124 (3d Cir. 2013). In that case, however, the court noted that the plaintiff claimed to point to two potential comparators, but found that neither one was similarly situated. <u>Id.</u> He also cites <u>Carson v. Mulvihill</u>, 488 F. App'x 554, 563 (3d Cir. 2012), but again the court found that "Carson does not allege facts showing that he was similarly situated to the inmates who received wheelchair footrests, crutches and canes, or that there was no rational basis for his different treatment." Oddly, he claims that, "[b]y the plain meaning of the standard articulated in <u>Perano</u>, a Plaintiff [sic] need not identify the names of similarly situated individuals." (ECF No. 25 at 2.) As the quotation from <u>Perano</u> above indicates, this is simply wrong.

Plaintiff has not cited to a recent case in which the Court of Appeals has concluded that a complaint that fails to identify any similarly situated individuals who received different treatment is sufficient to survive post-<u>Iqbal</u>. Moreover, his claim that he was treated differently not because PADEP issued him a finding of no violation but because PADEP issued multiple, conflicting reports could potentially allow for the existence similarly situated individuals (those who were not given multiple, conflicting reports) but, as noted above, these allegations do not state a recognized claim for relief. Again, the equal protection clause of the United States Constitution is not concerned with how many reports PADEP issues or whether it stamps the word "DRAFT" on one of them, but with whether Plaintiff alleges that the <u>treatment</u> he received (a finding of no violation) differs from that of other similarly situated individuals (landowners with debris left on their property where PADEP found a violation), with no rational basis for the distinction.

Defendants also argue that Plaintiff's claim fails because he cannot allege that no rational

basis exists for PADEP's determination that no violation had occurred. Defendants note that even Plaintiff does not allege that the environment has been detrimentally affected by the pile of logs and stumps left on his property, only that the pile constitutes "an eyesore." Plaintiff argues that he does not have to allege harm to the environment to state a claim for equal protection, but he misses the point. The fact that there was no harm to the environment means that PADEP did act rationally when it found no violation: PADEP has no statutory or regulatory authority to require D&L Energy to address the esthetics of the pile.[6] Plaintiff also contends that the Defendants' actions "were irrational and arbitrary based on Pennsylvania regulations, PADEP's Oil and Gas Operator's Manual, and D&L's erosion and sediment control plan…." (ECF No. 19 at 15.) As noted above, this Court does not sit as a court of review over the issues of whether PADEP followed its usual internal procedures or whether D&L was in compliance with its erosion and sediment control plan.

Because Plaintiff has failed to state a claim for class of one equal protection, the motion to dismiss will be granted.

Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is an objective decision to be decided by the court as a matter of law. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004). Moreover, the Supreme Court has stressed that

---

[6] Plaintiff's argument that "Defendants do not articulate a state interest that justifies singling out Mr. Peterson for disparate treatment" (ECF No. 19 at 13) is off point. The rational basis relates to the reason for finding no violation, not for treating him differently.

the qualified immunity question must be resolved "at the earliest possible stage in the litigation." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Defendants argue that the Complaint fails to establish a violation of a constitutional right and also that a reasonable person in their position would not have been aware that his conduct violated Plaintiff's clearly established rights. Plaintiff disputes each of these contentions.

As discussed above, the Complaint fails to allege a violation of a constitutional right, particularly given Plaintiff's insistence that his claim is not predicated upon the differing treatment he received in the form of a no violation finding, but upon the multiple, conflicting reports PADEP generated, allegedly differing from its usual procedures. In addition, the factual allegations in the Complaint provide no basis for concluding that Plaintiff's right not to have PADEP generate multiple, conflicting reports was clearly established in 2012. For this reason also, the motion to dismiss will be granted.

<u>John and Jane Doe Defendants</u>

Defendants argue that Plaintiff makes no factual allegations against the Doe Defendants and for that reason, the claims against them should be dismissed. Plaintiff responds that the case Defendants cite holds only that "an action cannot be maintained solely against Doe defendants." Hindes v. F.D.I.C., 137 F.3d 148, 155 (3d Cir. 1998).

The only mention of the Doe Defendants in the Complaint is in paragraph 11, which states, in its entirety:

> Defendant(s) Jane Doe 1-10 and John Doe 1-10 are unknown to Mr. Peterson. Mr. Peterson therefore sues them under these fictitious names. Mr. Peterson will amend this complaint to add their true names and capacities when they become known. Unless otherwise specified, the terms Defendant and Defendants in this complaint refer to Defendants Oprendek and Zimmer.

(Compl. ¶ 11.) Thus, Defendants have correctly observed that the Complaint makes no factual

allegations against these individuals, whoever they are. There is a difference between alleging facts against individuals whose identity a plaintiff has not yet ascertained and merely alleging the existence of 20 other individuals but not providing any information as to what they did.

Nevertheless, the Court need not decide whether Defendants' argument is availing because, even accepting Plaintiff's argument, that is precisely the situation presented here: for the reasons cited above, the claims against the named Defendants should be dismissed, which would leave the action pending solely against the Doe Defendants, which is not permitted. Therefore, the claims against the Doe Defendants will also be dismissed.

Amendment

Defendants argue further that Plaintiff should not be given leave to amend his complaint as any claim arising out of the facts alleged would be barred by the statute of limitations and fails to state a claim for equal protection, and thus any amendment would be futile. This Court agrees.

The Court of Appeals has "made it clear that an amendment would be futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (citation omitted). Plaintiff has suggested no basis upon which he could amend the Complaint to avoid the fact that it was untimely brought or that his allegations do not state a claim for a class of one equal protection violation. Therefore, amendment of the Complaint would be futile.

An appropriate order follows.

ORDER

AND NOW, this 28th day of May, 2015, for the reasons stated above,

IT IS HEREBY ORDERED that the motion to dismiss filed by the defendants (ECF No. 11) is granted.


s/Robert C. Mitchell_____<br>ROBERT C. MITCHELL<br>United States Magistrate Judge